IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 2, 2016

## IN RE GABRIELLA M.[1]

**Appeal from the Juvenile Court for Greene County**
**No. J26200     Kenneth N. Bailey, Jr., Judge**

_____

**No. E2015-02507-COA-R3-PT – Filed August 15, 2016**

_____

This appeal involves the termination of a mother's parental rights to her minor child. Following a bench trial, the trial court found that clear and convincing evidence existed to support the termination of her rights on the statutory grounds of abandonment for failure to visit; substantial noncompliance with the requirements of the permanency plan; and the persistence of conditions which led to removal. The court further found that termination was in the best interest of the child. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, P.J., M.S., and KENNY ARMSTRONG, J., joined.

Gerald T. Eidson, Surgoinsville, Tennessee, for the appellant, Tiffany M.

Herbert H. Slatery, III, Attorney General and Reporter, and M. Cameron Hines, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

## I.     BACKGROUND

Gabriella M. ("the Child") was born to Tiffany M. ("Mother") in April 2010. Zachariah M. is listed as the father on the child's birth certificate; however, Mother later identified Seth R. as the Child's father. Following the Child's birth, Mother, who was

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

sixteen years old at the time, moved in with Vinnie M. ("Grandmother"), her grandmother.

On November 2, 2012, Grandmother petitioned for temporary custody of the Child. She alleged that Mother failed to parent the Child and often left the Child in her care for extended periods of time. Following a hearing, the court adjudicated the Child as dependent and neglected and awarded visitation to Mother and temporary custody to Grandmother. Mother remained in the home. The living situation remained unchanged until May 15, 2013, when the Tennessee Department of Children's Services ("DCS") removed the Child based upon allegations of environmental neglect and Mother's continued inability to parent the Child. The court again adjudicated the Child as dependent and neglected, citing "grave concerns regarding the safety of the current residence of the [C]hild, the delayed development of the [C]hild, and the personal life and the ability of [Mother] to properly parent the [C]hild."

Mother participated in the development of an initial permanency plan, dated June 13, 2013.[2] Pursuant to the plan, Mother was required to (1) submit to random drug screens; (2) if found positive for drugs, complete an alcohol and drug assessment, follow recommendations, and sign releases of information; (3) provide a permanent, safe, and stable home; (4) complete a clinical parenting assessment and follow recommendations; (5) complete a bonding assessment; and (6) comply with the requirements of her probation and refrain from incurring additional charges. Mother also signed a Criteria and Procedure for Termination of Parental Rights on February 10, 2014, indicating that she had received a copy of the form and had been given an explanation of its contents. Thereafter, Mother refused to sign subsequent forms indicating the same.

On August 1, 2014, DCS sought termination of Mother's parental rights to the Child. DCS pursued termination of Mother's rights based upon the following four grounds: (1) abandonment for failure to visit; (2) abandonment for failure to remit child support; (3) substantial noncompliance with the requirements of the permanency plans; and (4) the persistence of conditions which led to removal.[3] DCS also claimed that termination of Mother's rights was in the best interest of the Child.

The hearing on the termination petition was held over the course of several days in May, July, August, and November 2015. Grandmother testified that Mother and the Child moved in with her approximately three weeks after the birth of the Child. She

---

[2] This plan was ratified by the trial court. The plans were also renewed at later dates; however, Mother's responsibilities remained the same.

[3] DCS also sought termination of Zachariah and Seth's parental rights. Their rights are not at issue on appeal.

claimed that Mother initially cared for the Child and was a "good mother." She opined that Mother's behavior digressed when Mother began spending time with boys. She stated that Mother often left the Child with her and that she filed a petition for temporary custody after she observed Mother spanking the Child. She also accused Mother of stealing from her.

Grandmother testified that Mother currently lives in her home and had been residing there with Mother's second child, Paisley, since March 2015. She stated that Mother did not pay rent and did not contribute to the household expenses. She provided that she cared for Paisley while Mother worked. She asserted that Mother was capable of caring for Paisley without assistance but agreed that Mother needed assistance when caring for the Child.

Clifford Miller, a licensed clinical social worker, testified that he first began working with the Child, who presented as a "developmentally delayed" three-year-old, in June 2013. He explained that she displayed aggressive behaviors, that she lacked certain motor skills, and that her speech and cognitive abilities had not developed in accordance with her age. He performed a number of tests and ultimately diagnosed the Child as suffering from isodicentric chromosome 15 syndrome, which is a developmental disorder that affects cognitive, physical, and emotional functions. He explained that there was not a cure for the disorder, meaning that the disorder would affect her in some capacity for the remainder of her life. He agreed that the Child was capable of learning activities and behavioral skills to address the symptoms of her condition.

Mr. Miller asserted that the Child needed an organized, structured environment with caretakers that understood her condition and possessed the ability to learn and implement skills necessary to address her symptoms. He surmised,

> In fact, I can foresee the need as th[e C]hild continues to grow for a parent to be able to be available almost full time, to work with the schools, to work with the various professionals and during holidays, weekends, vacation times, be there with the [C]hild.

He provided that disciplining the Child would also require the ability to address her improper behavior in a calm and consistent manner. He explained that "aggression with [the Child], verbal or physical, will simply teach her how to be more aggressive verbally and physically."

Mr. Miller acknowledged that the court provided him with the authority to determine Mother's ability to engage in visitation in August 2013. He explained that she had been instructed to comply with services and that he was then required to adjust her

visitation as she progressed.  He stated that he offered her the opportunity to learn about the Child's condition and participate in supervised and therapeutic visitation.  He claimed that his first contact with Mother occurred in February 2014.  He recalled that Mother completed a personality assessment, which revealed narcissistic and manipulative tendencies.  He stated that she presented as uninterested or detached from her family, including the Child.  He provided that he was unable to discuss the results with her because she never returned to the office for services.  He stated that his findings were concerning given the Child's need for continued care and attention.

Mr. Miller stated that Mother attended one supervised visitation on April 22, 2014. He described the visit as follows:

> It was interesting that [the Child] did not seem to recognize [Mother]. There was no real sense of attachment at all between the [C]hild and [Mother].  [Mother] made very little effort to engage [the Child].  [The Child] seemed to be uninterested in [Mother].  [She] sat there and watched [the Child] play the majority of the session.  She didn't read to her.  She didn't talk to her.  There was just very little interaction at all.

He believed that Mother displayed a lack of interest in the Child.

Mr. Miller testified that it was also difficult to maintain contact with Mother.  He explained,

> There were a number of occasions where, for example, she just didn't show up to the appointment.  She didn't call to cancel.  We would hear from her again in several weeks to a month.  We would reschedule.  The last contact was on [April 22], when we had the visit.  Her difficulty was providing or obtaining transportation to come to the office.  So what I suggested to her was she secure transportation, she give us a phone call and we will work with her and schedule.  . . . I didn't hear from her for a long time and I don't remember what day it was, but three to four weeks after this appointment, I believe it was sometime in May, she gave me a phone call, left a message for me to call her.  I attempted within a couple of days to call her back and her phone had been disconnected.

He stated that he never heard from her again, despite his instruction to her to, "Burn up the phone.  If you can't reach us, we're very busy, don't hesitate to keep calling."  He provided that he closed the case in June 2014 due to Mother's failure to maintain contact.

Mr. Miller opined that placing the Child with Mother would be detrimental to the Child's overall welfare. He continued,

> I don't think that [the Child] knows who her birth mother is. I don't think that [the Child] would respond very well [to a change in caregivers,] and I don't think that [Mother] has the ability to parent [the Child] in a manner in which [the Child] is going to require, very structured, consistent, reliable parenting. So I think it would be a disaster[,] and I think [the Child] would regress quickly. And the work, the hard work that has been accomplished over almost two years would be gone.

He stated that the Child's foster family had gained the experience to address her needs and provide the necessary care and attention. He provided that she had shown significant improvement in her speech and socialization skills, as evidenced by her interaction with other children and adults.

Elizabeth Hayward testified that she is employed by Foundations for Life Principles as the Clinical Director and Chief Assessor. She provides in home services for families and conducts parenting assessments in addition to providing general oversight of all services provided by the company. She recalled receiving a referral for Mother's parenting assessment on July 2, 2013. She stated that Mother met with her on one occasion but failed to return or to respond to her future attempts at communication. After approximately one year, she contacted DCS in an attempt to coordinate contact by attending a scheduled visitation. She attended two previously scheduled visitations, one on January 26, 2015, and another on February 9, 2015. Her observations led her to believe that Mother's bond with the Child was "pretty weak." She stated that Mother's communication with the Child was "[l]imited" and that Mother appeared "distracted" throughout the visit and failed to initiate interaction with the Child. She recounted a similar observation following the second visitation.

Ms. Hayward testified that she conducted the parenting assessment following the visitations and issued a completed report on February 26, 2015. She recalled that Mother displayed an "angry undertone" and was preoccupied with her telephone throughout the assessment. She provided that the assessment revealed "significant barriers" in Mother's ability to parent the Child. She surmised that Mother needed continued services and should be required to show lasting improvement before regaining custody of the Child. She recommended that Mother undergo drug testing, complete a mental health evaluation and follow all recommendations, attend counseling to address anger management issues, attend a parenting education program, obtain suitable housing, and continue supervised visitation.

Stephanie Taylor testified that she is employed by Health Connect America as a Family Development Specialist and in-home counselor. She recalled receiving a referral in April 2015 to provide parenting education services to Mother. She spoke with Mother and scheduled two meetings but alleged that Mother cancelled each meeting due to work obligations or transportation issues. She was unable to provide services because her referral only authorized services through April 2015.

Mother testified that she is currently pregnant with her third child and that she and Paisley live with Grandmother. She stated that she is currently employed at a restaurant in Pigeon Forge and that she works six or seven days per week from approximately 10 a.m. to 12:00 a.m.[4] She asserted that with the exception of a few months, she has maintained employment at various restaurants throughout the Child's involvement with DCS. She receives an hourly wage of approximately $2.13 per hour in addition to tips provided by customers. She stated that her child support obligation is automatically deducted from her paycheck and that she advised the child support office each time her employment changes. She explained that she assumed her obligation was regularly fulfilled because she did not receive a check each month. She acknowledged that she did not pay rent or contribute to household expenses but asserted that she is responsible for her telephone bill in the amount of $100 per month, car insurance in the amount of $200 per month, a car payment in the amount of $300 per month, and Paisley's expenses.

Mother acknowledged that she "likely" participated in the development of the Child's permanency plan when the Child was placed into DCS custody. She agreed that she had not completed a drug assessment as required but asserted that she has never taken drugs. She likewise agreed that she had not completed parenting classes but claimed that she was never contacted to arrange classes. She stated that she completed her parenting assessment but agreed that she had not complied with the recommendations from the assessment. She stated that she did not "see the point" in complying because the recommendations were generated by a computer. She stated that she is working to obtain stable housing. She claimed that her greatest barrier in complying with services was her inability to work well with Holly Dean, the family service worker assigned to her case. She stated that her request for a new caseworker was denied. She provided that she was doing well and cooperating with DCS before Ms. Dean was assigned to her case.

Mother acknowledged that she could benefit from additional training regarding the care and assistance needed to address the Child's unique needs. She asserted that despite the need for training, she was capable of caring for the Child. She agreed that she and the Child did not have a significant bond due to the limited amount of visitation provided.

---

[4] Mother later testified in rebuttal that she reduced her hours following the birth of her third child.

Mother acknowledged that she only visited the Child on one occasion from April 2014 through August 2014. She stated that she did not attempt to contact Mr. Miller to schedule visitation because he advised her that he was "off the case" in April 2014. She claimed that Ms. Dean refused to respond to her attempts to schedule visitation and that she was unable to arrange transportation during that same time period. She explained that she did not qualify for TennCare transportation but acknowledged a previous statement in which she claimed that she was not the "type of person" that used such transportation. She acknowledged that she did not advise DCS of her inability to arrange transportation through TennCare.

Relative to her current visitation schedule with the Child, Mother claimed that her ability to interact with the Child was hindered by the presence of Grandmother and the foster mother. She stated that she brought food to each visit and attempted to interact with the Child, despite the distraction caused by others. She alleged that it was difficult to schedule visitation because of her work schedule. She insisted that she maintained contact with DCS and provided them with current contact information.

Derek Goins testified that he is employed by OmniVisions as a Resource Coordinator. He provided that he has served as the Child's case manager since November 2014. He denied any difficulty in maintaining contact with Mother and stated that he has supervised approximately 15 or 16 visitations between Mother and the Child. He asserted that Grandmother was no longer permitted to attend visitation because Mother was less engaged with Grandmother present. His observations led him to question Mother's ability to care for the Child. He explained that the Child was difficult to control without the help of the foster mother.

Mr. Goins admitted that it was difficult to schedule visitation around Mother's work schedule but agreed that she had only cancelled two visits due to work obligations. He noted that Mother advised him that she had trouble arranging transportation at times but asserted that transportation never affected her ability to visit. He confirmed Mother's inability to work with Ms. Dean but claimed that he never found occasion to question Ms. Dean. He provided that Mother also refused to participate in meetings when Ms. Dean was present. He stated that Mother denied his attempt to assist her in completing the requirements of the permanency plan. He recalled that she denied the need for anger management, despite her tendency to react to him and others in anger.

Mr. Goins testified that he also worked with the foster family. He provided that he met with the family two or three times per month and opined that the Child evidenced a bond with the foster mother. He believed that the foster family was able and willing to care for the Child in a manner sufficient to address the symptoms of her condition.

Ms. Dean testified that she is employed by DCS as a family service worker. She provided that the Child was placed into DCS custody in May 2013 based upon allegations concerning Mother's inability to parent and the condition of Grandmother's residence. She was assigned to the Child's case in December 2013. She recalled reviewing the Criteria and Procedure for Termination of Parental Rights with Mother on February 10, 2014. She stated that additional copies were also mailed to Mother on July 23, 2014, and June 11, 2015. She claimed that it was difficult to maintain contact with Mother and that Mother was not responsive to her and other provider's attempts at communication until November 2014, a few months following the filing of the termination petition.

Relative to visitation, Ms. Dean testified that Mother visited one time during the pertinent four-month time period. She asserted that Mother was notified of her obligation to visit and the consequences for failure to visit. She claimed that Mother never advised her of any difficulty in procuring transportation and that Mother was advised of the possibility of procuring transportation through TennCare if needed. She explained that the Child qualified for TennCare services, thereby enabling Mother to procure transportation for visitation through the Child. She recalled that Mother was specifically advised to contact Mr. Miller to arrange visitation at his office. She provided that Mother later indicated that her attempts to contact Mr. Miller were unsuccessful. She stated that despite Mother's assertion, she and Mr. Miller could not locate Mother.

Relative to child support, Ms. Dean testified that Mother was notified of her obligation to remit child support in the amount of $15 per month. She asserted that Mother was employed during the pertinent time period but only remitted two payments, one payment of $3.46 and another of $13.84. She agreed that Mother was ordered to remit payment through an automatic income wage assignment. She provided that despite the automatic nature of the system, Mother remained obligated to notify the office of any changes in employment and to remit payment directly to the office if the proper amount was not automatically deducted from her paycheck each month.[5] She claimed that Mother never advised her of any issues concerning the income wage assignment.

Ms. Dean testified that Mother participated in the creation of the initial permanency plan, dated June 13, 2013. She recalled that Mother was required to (1) submit to random drug screens; (2) if found positive for drugs, complete an alcohol and drug assessment, follow recommendations, and sign releases of information; (3) provide a permanent, safe, and stable home; (4) complete a clinical parenting assessment and follow recommendations; (5) complete a bonding assessment; and (6) comply with the requirements of her probation and refrain from incurring additional charges. She recalled

---

[5] Mother testified in rebuttal that she notified the office of her changes in employment. She provided that she believed her child support was satisfied by her income wage assignment but that she was ready and willing to remit payment for any arrears.

that the plan was revised four times but that the action steps remained the same. She provided that she either reviewed the revised plan with Mother or mailed her a copy of the revisions.

Ms. Dean testified that Mother failed to complete any of the action steps *prior* to the filing of the termination petition. She agreed that Mother completed a parenting and bonding assessment *after* the termination petition was filed. She claimed that with the exception of submitting to random drug screens and resolving her criminal charges, Mother failed to follow the recommendations from the assessment. She recalled discussing Mother's failure to comply during progress review meetings and child and family team meetings. She asserted that Mother indicated that her failure to comply was a result of her dislike for those involved. She recalled that Mother also advised those in attendance that she would not comply because the recommendations were generated by a computer. She admitted that Ms. Taylor, the parenting educator, did not attend Mother's visitation, despite frequent invitations. She provided that Mother likewise failed to schedule an individual appointment with Ms. Taylor.[6]

Ms. Dean admitted that Mother disliked her and had issued complaints about her to her supervisor. Ms. Dean asserted that despite Mother's contempt, she remained willing to work with her and attempted to provide assistance to the extent allowed by her. She claimed that there were times when Mother was responsive to her suggestions and guidance.

Ms. Dean testified that the conditions which led to removal persist and have continued throughout the life of the case, approximately 27 months. She explained that Mother even admitted her continued inability to parent the Child at a hearing in May 2014. She claimed that the Child currently resides in a pre-adoptive home that is equipped to address her unique needs. She believes the Child is doing well in the home and has evidenced signs of improvement. She stated that the Child established a bond with her foster parents and recognizes them as her parents.

Debbie J. ("Foster Mother") testified that the Child was placed in her home on January 28, 2014. She provided that she is a certified nursing assistant and that she has experience in caring for special needs children as evidenced by her son's cerebral palsy condition. She stated that she also received some training through OmniVisions. She believed the Child evidenced signs of major improvement since her placement in the home. She provided that the Child was enrolled in ballet classes and had also attended cheerleading classes in the past. She believed that the Child worked well with other

---

[6] Mother testified in rebuttal that Shelly Johnson replaced Ms. Taylor because Ms. Taylor was unresponsive. She stated that she worked well with Ms. Johnson, who visited her home and attended a visitation.

children and was doing well in school. She stated that the Child received occupational therapy while in school but no longer needed physical therapy. She acknowledged the Child's need for continued long-term care and expressed a desire to adopt the Child.

Following the hearing, the trial court found clear and convincing evidence to support termination based upon the statutory grounds of (1) abandonment for failure to visit; (2) substantial noncompliance with the requirements of the permanency plans; and (3) the persistence of conditions which led to removal. The court also found clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.    Whether clear and convincing evidence supports the court's termination based upon a finding of abandonment for failure to visit pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i).

B.    Whether the court erred in failing to terminate Mother's parental rights based upon her failure to remit child support pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i).

C.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Child pursuant to Tennessee Code Annotated section 36-1-113(i).

## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of

natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1)    [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2)    [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, -- S.W.3d --, No. M2014-00453-SC-R11-PT, 2016 WL 819593, at *12 (Tenn. Jan. 29, 2016) (internal citations omitted).

## IV. DISCUSSION

### A. & B.

In terminating Mother's parental rights based upon the statutory ground of abandonment, the court considered Mother's failure to visit and remit support for the four months preceding August 1, 2014, the filing date of the termination petition. The relevant time period was April 1, 2014, through July 31, 2014.[7] A parent's willful failure to visit the child "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is defined as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(c). A parent's willful failure to support the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

---

[7] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

Citing *In re D.D.K*, No. M2002-01016-COA-R3-PT, 2003 WL 23093929, at *7 (Tenn. Ct. App. Dec. 30, 2003), Mother argues that the court erred in terminating her parental rights based upon her failure to remit child support. She claims that the court never advised her of the consequences for her failure to visit the Child during the requisite time period. DCS responds that the record belies Mother's assertion and further claims that the court erred in refusing to terminate Mother's parental rights based upon her failure to remit child support.

Relative to Mother's failure to visit, the facts of this case are simply inapposite to the facts presented in *D.D.K.* In *D.D.K.*, the father was never given notice of the consequences for failure to visit, was never included in any permanency planning or review hearings, and was never given any notice of such meetings or hearings in accordance with Tennessee Code Annotated section 37-2-403. 2003 WL 23093929, at *6-7. Here, the record reflects that Mother signed a copy of the Criteria and Procedures for Termination of Parental Rights and that she was advised of the consequences of her failure to visit during the requisite time period. *See* Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii)(a) (providing that termination may be upheld if the record reflects the parent signed the portion of the permanency plan describing the criteria for establishing abandonment). Mother simply failed to schedule visitation as required. Accordingly, we conclude that there was clear and convincing evidence to establish that Mother willfully failed to visit the Child during the relevant time period.

Relative to Mother's failure to remit child support, the record reflects that Mother was ordered to remit payment through an automatic income wage assignment. Mother testified that she advised the requisite authorities of her changes in employment and that she believed her income was withheld in accordance with the wage assignment. With these considerations in mind, we agree with the trial court that the record is devoid of evidence establishing Mother's willful failure to remit child support.

Only one statutory ground must be established by clear and convincing evidence to support the termination of a parent's parental rights when termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Audrey S.,* 182 S.W.3d at 862 (citations omitted). Mother did not appeal or make any argument in her appellate brief on the grounds of substantial noncompliance and the persistence of conditions which led to removal. In such cases, our Supreme Court offered the following instruction:

> [I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.

*In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) (internal citation and footnote omitted). Accordingly, we will review the remaining grounds.

1.

"A parent's rights may be terminated for her substantial noncompliance with the responsibilities contained in a permanency plan, [Tennessee Code Annotated section 36-1-113(g)(2)], so long as the plan requirements are 'reasonable and related to remedying the conditions which necessitate[d] foster care placement.'" *Id.* at 537 (quoting *In re Valentine,* 79 S.W.3d at 547). Here, Mother was required to (1) submit to random drug screens; (2) if found positive for drugs, complete an alcohol and drug assessment, follow recommendations, and sign releases of information; (3) provide a permanent, safe, and stable home; (4) complete a clinical parenting assessment and follow recommendations; (5) complete a bonding assessment; and (6) comply with the requirements of her probation and refrain from incurring additional charges. The record reflects that Mother submitted to random drug screens and refrained from incurring additional charges. While Mother also completed the parenting assessment with a bonding component, this task was only begrudgingly completed after the termination petition had been filed. Mother also refused to follow the majority of the recommendations from the assessment as required by the permanency plan. With these considerations in mind, we hold that the record contains clear and convincing proof to support the trial court's findings regarding Mother's substantial noncompliance.

2.

Under Tennessee law, a court may terminate parental rights when:

(3)     The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A)     The conditions that led to the child's removal *or other conditions* that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine,* 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.,* 182 S.W.3d at 874.

As a threshold issue, we must address the fact that the Child was removed from Grandmother's care. Application of this statutory ground in such cases is generally prohibited pursuant to the plain meaning of the statute. *See In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *7 (Tenn. Ct. App. Feb. 27, 2015) (reversing termination of a father's parental rights based upon the persistence of conditions when the children were not removed from his home). Here, the Child was adjudicated as dependent and neglected and placed with Grandmother as an *alternative* to DCS custody when it was determined that Mother could not adequately care for the Child. The Child was then removed from Grandmother and placed into DCS custody based upon Grandmother's inability to provide a suitable home. With these considerations in mind, we hold that the facts of this case support the court's consideration of this statutory ground of termination.

The record reflects that the conditions which led to removal have not been remedied, namely Mother's inability to parent and provide a suitable home. Despite adequate time in which to address the conditions, Mother has failed to progress or estimate when she might be able to provide suitable care. Indeed, the record reflects that Mother was uncooperative throughout the entirety of the case and failed to maintain contact with her service providers until after the termination petition had been filed. The testimony presented also established that the Child resides in a pre-adoptive home and is bonded to her foster family. With these considerations in mind, we conclude that the record contains clear and convincing proof in support of the trial court's termination decision based upon the persistence of conditions which led to removal.

C.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground to terminate Mother's parental rights, we must consider whether termination was in the best interest of the Child. In making this determination, we are guided by the following non-exhaustive list of factors:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[8]

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

---

[8] *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

A number of the best interest factors weigh against Mother. She had not made the adjustment of circumstances necessary to make it safe and in the Child's best interest to be in her home. Tenn. Code Ann. § 36-1-113(i)(1), (7). Relative to DCS's efforts, the record was replete with information concerning the effort to assist Mother. Having reviewed the evidence, we conclude that DCS expended more than reasonable efforts in attempting to assist her when she was uncooperative and unresponsive but that she simply failed to make a lasting adjustment. Tenn. Code Ann. § 36-1-113(i)(2). While Mother has maintained consistent visitation since the filing of the termination petition, the record reflects that the Child does not evidence signs of attachment toward her. Tenn. Code Ann. § 36-1-113(i)(4). The Child resides in a safe and stable foster home. Removing her would negatively affect her emotional and psychological condition. Tenn. Code Ann. § 36-1-113(i)(5). The Child has simply languished in custody for far too long and should be allowed to achieve permanency and stability in her current placement. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Child. We affirm the decision of the trial court.

## V. CONCLUSION

This judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Tiffany M.

_____
JOHN W. McCLARTY, JUDGE